Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/19/2016 09:06 AM CDT

In re Interest of Darius A., a child
under 18 years of age.
State of Nebraska, appellee and cross-appellee,
v. Stephanie H., appellant, and Gregory A.,
appellee and cross-appellant.

___ N.W.2d ___

Filed July 19, 2016.    No. A-15-773.

1. **Juvenile Courts: Evidence: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.
2. **Juvenile Courts: Jurisdiction.** The purpose of an adjudication phase of a neglect petition is to protect the interests of the child.
3. **Juvenile Courts: Jurisdiction: Proof.** At the adjudication stage, in order for a juvenile court to assume jurisdiction of a minor child under Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014), the State must prove the allegations of the petition by a preponderance of the evidence, and the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247.

Appeal from the Separate Juvenile Court of Lancaster County: Reggie L. Ryder, Judge. Affirmed.

Lisa M. Gonzalez, of Gonzalez Law Office, L.L.C., for appellant.

Joe Kelly, Lancaster County Attorney, and Ashley J. Bohnet for appellee State of Nebraska.

Susan L. Kirchmann, of Wertz & Associates, for appellee
Gregory A.

Pirtle and Bishop, Judges.

Pirtle, Judge.

## I. INTRODUCTION

Stephanie H. appeals and Gregory A. cross-appeals from
the order of the separate juvenile court of Lancaster County
adjudicating the minor child, Darius A., as a child within the
meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014).
For the reasons that follow, we affirm.

## II. BACKGROUND

Stephanie and Gregory are the parents of Darius. They were
married from December 2004 until February 2015. Darius
was born in November 2001 and has significant neurological
problems that stem from prematurity. Darius was born with
periventricular leukomalacia, central apnea, severe seizure dis-
order, and cerebral palsy. He is intellectually challenged, has
some behavioral problems, and has been diagnosed as a child
on the autism spectrum.

Multiple reports were made to the abuse hotline regarding
Darius, but they were screened out by the Nebraska Department
of Health and Human Services (DHHS) and not accepted.
There were also numerous reports made in the past related to
Darius' medical condition, all of which were determined to be
unfounded. A case was accepted by DHHS regarding Darius
due to concerns raised by Dawes Middle School (Dawes) in
Lincoln, Nebraska, and Dr. George Wolcott, Darius' pediatric
neurologist. The concerns were that Stephanie was not able to
meet Darius' medical, mental, educational, or physical health
needs. The case was assigned as a "dependent child intake"
case, rather than a case with allegations of abuse or neglect at
the fault of the parent.

On February 28, 2015, the State filed a petition alleging
that Darius was within the meaning of § 43-247(3)(a) due

- 180 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

to the fault or habits of Stephanie and Gregory. The petition alleged that Stephanie and Gregory failed to provide for Darius' educational needs, as Darius had missed numerous days of school during the 2014-15 school year. The absences were marked "parent acknowledged, medically documented or illness," and only the medically documented absences were marked excused. The petition also alleged that Stephanie failed to administer Darius' medication as prescribed and/or recommended by Darius' treating neurologist and that she failed to follow up with medical appointments or treatment as recommended by Darius' treating physician.

A formal adjudication hearing was held on May 19, June 15, and July 16 and 20, 2015. Toward the end of the formal hearing, the State was given leave to amend the petition to conform to the facts presented at the hearing.

On July 23, 2015, the separate juvenile court of Lancaster County issued an order adjudicating Darius as a child within the meaning of § 43-247(3)(a). The court found that Darius lacked proper parental care by reason of the fault or habits of his parents. The court found Stephanie and Gregory neglected or refused to provide the necessary education or other care necessary for the health, morals, or well-being of Darius in that Darius missed almost 60 days of school in the 2014-15 school year. The court also found Stephanie failed to administer his medication as prescribed or recommended by Darius' treating neurologist and failed to follow up with medical appointments or treatments as recommended.

## 1. Medical History

Wolcott testified that several of Darius' medical conditions fall under the "umbrella [of] Lennox Gastaut" syndrome. Darius' medical conditions affect his intellect, behavior, and ability to complete physical tasks. Stephanie testified that Wolcott was Darius' neurologist from 2000 to 2005 and that he then retired. Wolcott began practicing again and resumed treating Darius. Karee Shonerd is a registered nurse and the

- 181 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

coordinator of specialty clinics at a Lincoln hospital. When Wolcott is not in the office, Shonerd calls him with urgent concerns from parents or takes messages on his behalf.

Darius has been prescribed a number of medications consistently including Klonopin and Banzel. Darius started on Lamictal in 2005. By 2014, Wolcott became concerned with the use of Lamictal due to toxicity and prescribed a medication called Onfi instead. Wolcott prescribed a decrease in the Lamictal dose and prescribed an initial dose of 10 milligrams of Onfi twice per day, to be increased to 20 milligrams twice per day after 1 week. Onfi was to be given in the morning and the evening, when Darius was at home, and his parents were responsible for the proper administration of the medication.

On July 7, 2014, Stephanie called Wolcott's office to discuss Darius' medication, as he started taking Onfi. Stephanie was given specific instructions for the dosage of Onfi. On July 21, Gregory reported to Wolcott's office that Stephanie misread the dosage instructions for Onfi and administered the drug at 10 milligrams twice per day for 2 weeks instead of 1 week.

On July 31, 2014, Stephanie called Wolcott's office with concerns about discontinuing Lamictal. Shonerd discussed the correct dosages with Stephanie; the prescribed dosage of Onfi at that time was to be 10 milligrams in the morning and 20 milligrams at bedtime. Stephanie reported to Shonerd that she was administering 15 milligrams, instead of 10 milligrams, of Onfi in the morning and 20 milligrams, as directed, at bedtime. Shonerd's notes indicate that Stephanie said she increased the dose of Onfi in the morning because she felt Darius needed an extra 5 milligrams of Onfi to compensate for the decrease in Lamictal.

Stephanie became concerned with Darius' behavior while taking Onfi, as she observed that he would not speak, eat, walk, or feed himself and that he would merely stare at the wall. She communicated her concerns with Wolcott 1 week after Darius started taking Onfi, and Darius was brought in for a followup

- 182 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

appointment on August 12, 2014. Stephanie indicated in a call to Wolcott's office on September 5 that she wanted to take Darius off of his medications because of the effect they were having on him.

Darius was admitted to the emergency room on September 8, 2014, and it was reported that he had a series of fairly significant seizures accompanied by significant respiratory issues. At that time, Wolcott became aware that Darius' medication was not being given as prescribed. Wolcott learned that Stephanie had initiated a "drastic taper" from the Onfi medication prior to Darius' hospitalization; she reported that she had been administering 5 milligrams of Onfi twice per day instead of the prescribed 20 milligrams twice per day. Wolcott determined there was a correlation between the seizures and the decreased dosages of Onfi, and testified that he believed the seizures were withdrawal seizures. He testified that with almost every patient, decreasing medications like Onfi too quickly can cause significant withdrawal symptoms including agitation, seizures, and death.

Wolcott developed a plan to wean Darius off of Onfi gradually over the course of 54 days. Starting on September 9, 2014, Stephanie was to administer 15 milligrams of Onfi for 3 days, then drop to 5 milligrams twice a day for 2 weeks, and then drop down to 5 milligrams for 30 days. This plan was provided to Stephanie when Darius was discharged, and she signed the form acknowledging her receipt.

Stephanie testified that she understood the plan was to decrease the dosage of Onfi slowly and that she "did the best [she] could with the knowledge [Wolcott] gave [her]." She was aware that decreasing Onfi drastically could cause a seizure that Darius may not recover from, and he had several seizures while he was being weaned off of Onfi.

Stephanie called Wolcott's office on September 23, 2014, to report that she decreased the Onfi dosage to 2.5 milligrams for 5 days and planned Darius' last dose of Onfi to be given on September 26. Shonerd's call logs indicate that she relayed this

- 183 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

information to Wolcott. Wolcott told Shonerd that Stephanie's dosage schedule meant Darius would be weaned from Onfi a month earlier than planned and that this was not as directed. Wolcott told Shonerd that he wanted to see Darius in October if he was coming off of Onfi so rapidly. The office notes indicate Darius' next appointment was moved from November to October. Wolcott testified that he had hoped that Darius would be weaned off of Onfi slowly, but because Darius was already on a lowered dose of Onfi, going back to the planned dosage schedule at that point would "re-exasperate the symptoms" that he had been concerned about.

A post on Stephanie's "Facebook" page, dated September 21, 2014, stated "TODAY: Starts The (1st) Day Without That *POISON*~~~"ONFI"! [reproduced as it appears]," which indicated she may have stopped administering Onfi prior to consulting Wolcott.

Wolcott testified that if changes to Darius' medication are made over the telephone, he immediately calls Shonerd to document the changes. He said that he trusts Stephanie to know what medication Darius is on and that she reports the medication Darius is taking at each appointment.

Shonerd testified that Stephanie is knowledgeable about Darius' diagnoses and symptoms and that the type of medication prescribed for Darius and the prescribed dosages changed frequently. However, Shonerd also testified that Stephanie had a history of not following Wolcott's recommendations regarding Darius' medication. She stated that Stephanie had a tendency to alter the medication dosage if she felt it was causing Darius problems and that these changes were made without the knowledge or consent of the treating doctor. Nevertheless, Shonerd said that she did not feel the need to contact Child Protective Services on Darius' behalf because she did not believe his life was in danger.

Stephanie told Shonerd on several occasions that she was administering Darius' prescriptions in amounts which were different than prescribed. On October 3, 2014, Stephanie

- 184 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

increased Darius' dosage of Klonopin without consulting Wolcott, and on October 31, she decreased the dosage of Dilantin. On November 21, Stephanie called to request that Darius' medication bottles be changed to reflect the way she was giving it. Shonerd's notes on November 25 indicate Shonerd told Stephanie that she should not increase Darius' medication on her own and that "Dr. Wolcott needs to be the one to make adjustment[s]." The clinic notes on May 26, 2015, indicate Darius' Dilantin prescription was not administered as directed.

Stephanie testified that she stopped attending Darius' appointments so she could rest while Darius was with Gregory, but that she had attended the most recent two appointments. She said Darius has followup appointments when Wolcott requests, or when the medication is not "going right." Wolcott's office notes indicate Stephanie told Shonerd that she did not attend the appointment on October 14, 2014, because she disagreed with Wolcott's treatment of Darius.

At the time of the adjudication hearing, Darius was prescribed Dilantin, Banzel, and Klonopin. Stephanie said that this medication regimen had been in place since October 2014 and that Darius continued to have seizures every 7 to 14 days.

Michelle Nunemaker, a child and family services specialist with DHHS, testified that she implemented drop-in visits in March 2015 due to concerns raised by Wolcott that Stephanie was administering Darius' medication incorrectly. Nunemaker reviewed the reports from drop-in workers and testified that she had no concerns with the administration of medication.

A family support worker testified that he provided drop-in services for Darius' family. He testified that he checked the prescription provided by the doctor, verified that the prescription matched the medication bottle, verified that the correct medication was given, and watched as it was administered. At the time he provided services, Darius was taking three medications and the family support worker did not have any concern regarding the correct administration of medication.

- 185 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

He testified that he never witnessed the wrong medication or dosage being given to Darius. The family support worker witnessed one seizure during a visit and testified that the parents reacted appropriately.

Another family support worker also provided drop-in services. She testified that she did not observe either parent make medication changes, unless verified by Darius' doctor, and that the administration of medication was consistent.

Darius had a primary care physician until approximately 6 weeks prior to the adjudication hearing. During his last office visit, Darius hugged a woman without her permission. Stephanie said she received a letter shortly after the appointment stating that the primary care physician's office could no longer treat Darius. Stephanie testified that she called four physician groups, but she was unable to find one who would accept Darius as a patient. She stated that if Darius were to become ill, she would try to get him into Wolcott's office or take him to "Urgent Care." Wolcott testified that he is not capable of being Darius' primary care physician.

## 2. Education

Darius was enrolled for the 2014-15 academic year at Dawes. Before the school year began, Stephanie gave a presentation to approximately 70 school staff members including paraeducators, the principal, and the vice principal. The presentation included instructions for Darius' wheelchair and how to pick Darius up from the floor after a seizure. A week prior to the start of the school year, Nancy Salsman, a special education coordinator at Dawes, met with Stephanie to discuss Darius' medication and preseizure activity. They also discussed the individualized education plan (IEP) and individualized health plan (IHP) in place for Darius from the school Darius attended during the previous academic year.

The school nurse at Dawes testified that she has spoken to Stephanie on several occasions regarding Darius' reaction to certain medication, the appropriate dosages of each medication,

- 186 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

and his overall well-being. The school nurse is present in the school 2 days per week. When she is not present, there is no other registered nurse present, but there is a health technician who is tasked with providing first aid and administering medication. The school nurse testified that Stephanie expressed concern that there is no nurse present at school for 3 of the 5 school days. The school nurse said the concern was passed on to her supervisor at the district office.

Nunemaker testified that Stephanie expressed concern that school staff were not trained or capable of caring for Darius' medical needs. Stephanie reported to her that she was concerned that Darius was not properly monitored after having a seizure at school.

During the 2014-15 school year, Darius had 11 seizures at school. When this occurs, the school contacts Darius' parents to determine whether Darius should stay at school or go home. Dickinson testified that if Darius goes home after a seizure, his absence is marked "M.D. or excused," which indicates a medically documented absence. On a few other occasions, Darius was sent home because his ambulation was unsteady, causing a safety risk. These absences were also marked as medically documented absences.

Salsman testified that a collaborative plan meeting is held once a student is absent from school for 10 days. The goal is to discuss the student's needs and how those needs are impacting attendance, so a plan can be made to improve attendance. A collaborative plan meeting was held for Darius on September 24, 2014, because he had missed 10 days of school. Stephanie indicated that Darius was taking a medication called Onfi and that it was contributing to his instability in school. Salsman stated that the school was aware of Darius' health issues and that there was an understanding that he may miss school. Salsman observed that at the beginning of the school year, Darius was very unstable. She said Darius' gait was labored, he was nonverbal, and he was not able to do tasks independently.

- 187 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

Darius was absent from school for almost all of the month of October 2014. Stephanie testified that issues which occurred at school on October 1 and 2 "set the course for 30 days of him missing school." She felt Darius was being isolated at school, which went against the conditions of the IEP. The "Facebook" account in Stephanie's name indicated she removed Darius from school because he was put into "Room #140" (Room 140). Darius' activity log for the day indicated he "went to Room 140 to sit in a safe seat" at various times throughout the school day on October 1, because he was extremely talkative and disruptive. Stephanie stated that his behavior could have been preseizure activity and that she was concerned that he was with a paraeducator and not with a teacher. She said paraeducators would not be trained to handle a seizure should one occur. Stephanie testified that she had never seen or requested to see Room 140 and that she was told the room is used for disruptive behavior.

Gregory testified that the decision to keep Darius out of school was a joint decision between him and Stephanie. He testified that he had not ever seen the inside of Room 140. He said, "Just the description of what they were doing to him was enough. Also because of his medical condition of the Onfi, he was not capable of going to school." Gregory testified that socialization provided in school is important and that Darius is able to learn certain skills. He also testified that it was his opinion that missing 60 days of school is not harmful to Darius.

Nunemaker testified that she was not concerned by Darius' extended absence from school, because of his medical condition. In addition, she noted that Onfi caused him to lose the ability to function in the way that he needed to before he could go back to school.

Salsman testified that Room 140 is a resource room. She testified that when Darius is in a room with students who function at the same level as him, he can be placed in a "safe seat" and he can practice behaviors. She said that a safe seat is

- 188 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

a seat away from the rest of the class and is used to "redirect . . . behaviors and get focused on the task at hand." Students in a safe seat are not left alone or physically restrained. In larger classrooms, Darius worked with a paraeducator, and when his behavior became disruptive, the safe seat did not help because his volume would increase and his behavior would disrupt everyone. Salsman said in that situation "we felt like it would be best to move towards the resource room and work on independent tasks there versus being in the large classroom setting."

A paraeducator who worked at Dawes testified that Room 140 can be used as a regular classroom. The room is a "Life Skills" classroom, and Darius reported there each morning and also had a few classes that were scheduled to meet in that room. She said if Darius struggled in a different classroom, he could be taken to Room 140 to calm down. She said the paraeducator would return with him to his regular classroom, if he was able.

Mary Ells, the assistant director of special education for Lincoln Public Schools, testified that she was made aware of Stephanie's concern that Room 140 was an "isolation placement" for Darius. She said that Room 140 is a classroom that is not used for seclusion, isolation, or punishment. She stated that if a child is taken to Room 140 to sit in a safe seat, the child is not left without a teacher or paraeducator present.

Ells and Salsman met with Stephanie in her home in late October or early November 2014 to discuss the learning processes used in the school and the behavior interventions used. They discussed how to work with the family to get Darius back to school. They addressed Stephanie's concerns that Darius was being placed in Room 140 as an isolation placement by telling her that is not what had happened and that is not what the room is used for. At the meeting, a checklist was made to clear up confusion related to the "communication book" that had been used to track Darius' activity at school. The checklist was to track seizure activity and

- 189 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

provide documentation for the school and the parents about Darius' health.

Ells said they also discussed Stephanie's vehicle at the meeting and how to respond to Darius' needs when transportation was or was not available. Salsman testified that Stephanie's car was not working at the time and that Stephanie did not want to send Darius to school without a car at her house. Stephanie was concerned that if Darius had a seizure at school, she would not be able to transport him home from school or home from the hospital, if necessary. Salsman stated that she worked with Stephanie's social worker to ensure that Darius' Medicaid would allow him to be transported from the hospital to the home. Stephanie was not comfortable with this arrangement, and she did not want him to return to school if she could not provide transportation.

Stephanie testified that Darius was transported to school by bus in the 2014-15 school year. She stated that she took him to doctor appointments and to school on several occasions, but also stated that she had not driven since 2001 and did not have a current driver's license. She did not have a vehicle at the time of the hearing. She said Gregory provided transportation for Darius on the occasions that he did not travel to school by bus. The school informed each busdriver regarding Darius' medical condition and what his needs were, should a seizure take place.

Salsman stated that it was her understanding that Darius was no longer taking Onfi when he returned to school in November 2014. She stated that he was still somewhat unstable in his gait and that he needed assistance with tasks, but he gradually improved and became more independent and stable. She said Darius improved through spring break and was able to perform simple tasks independently. After spring break, Darius had an increase in seizure activity, needed more assistance, and was not as communicative.

A Life Skills teacher in special education who taught at Dawes during the 2014-15 school year testified that Room

140 is a "work station area." This classroom has five work stations and a table set up for small group instruction. The Life Skills teacher testified that Darius did not make progress on the goals set forth in his IEP during the first part of the academic year. His goals were revised and made easier, and she stated that Darius made progress after his IEP meeting in October. Darius' IEP was reassessed in January 2015 when he was attending school more consistently, and his goals were made more difficult. She stated that Darius made progress at school when he attended school regularly, because the repetition of skills helped him to maintain and retain what he had learned.

Salsman testified that consistent attendance at school is important for students, particularly those with Darius' needs because missing school means he misses opportunities to make academic progress and to work on his social skills. She testified that when Darius attended school consistently during the second semester, he made "really great gains," including being social with his peers, being independent in his tasks, and reading out loud. She said she did not see the same level of progress during the first semester of 2014, because he was absent so often. Salsman said Darius' absences at the beginning of the 2014-15 school year did not correspond with the seizure patterns that were medically reported. After winter break, his absences more closely corresponded to the seizures that were reported.

### III. ASSIGNMENTS OF ERROR

Stephanie asserts the juvenile court erred in adjudicating Darius as a child within the meaning of § 43-247(3)(a), finding by a preponderance of the evidence that she neglected or refused to provide the necessary health and educational care.

On cross-appeal, Gregory asserts he did not neglect his child's educational needs by consenting to Stephanie's decision to keep Darius out of school for medical reasons.

- 191 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

## IV. STANDARD OF REVIEW

[1] Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

## V. ANALYSIS

[2,3] The purpose of an adjudication phase of a neglect petition is to protect the interests of the child. See *In re Interest of Laticia S.*, 21 Neb. App. 921, 844 N.W.2d 841 (2014). At the adjudication stage, in order for a juvenile court to assume jurisdiction of a minor child under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence, and the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Leticia S., supra*. Section 43-247(3)(a) states the juvenile court shall have jurisdiction of any juvenile who "lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile."

### 1. Adjudication Based Upon
### Acts of Stephanie

#### (a) Medication

Stephanie asserts the juvenile court erred by finding the State proved by a preponderance of the evidence that Darius lacked proper parental care because she failed to administer his medication as prescribed and failed to follow up

- 192 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

with medical appointments or treatment as recommended by Darius' treating physician. She asserts the State failed to prove that she was not administering medication appropriately and that she failed to take Darius to medical appointments. She also asserts the State failed to prove that her actions placed Darius at a definite risk for harm.

Stephanie argues that her testimony indicated that medication changes were frequently made over the telephone and were not always documented, other than in her calendar. She argues the testimony of Shonerd and Wolcott validates her testimony that medication changes were frequent and not always done when Wolcott was in the office. She testified that she followed Wolcott's dosage instructions to the best of her ability.

The evidence shows that Darius was born with several medical conditions requiring medication, as prescribed by a neurologist. The evidence also shows that at times, Stephanie made mistakes regarding the dosage of Darius' medication, and that at times, she adjusted dosages against medical advice. In July 2014, Darius was prescribed a specific dosage of Onfi. Shortly after starting the medication, Gregory reported to Darius' doctor that Stephanie made a mistake in administering the correct dosage. Darius was admitted to the emergency room in September, and Stephanie reported that Darius was taking 5 milligrams of Onfi twice a day. The prescribed dose at that time was 20 milligrams twice a day.

Stephanie had concerns about Darius' behavior and well-being while taking Onfi, and Wolcott developed a plan to wean Darius from the medication gradually over the course of approximately 6 weeks. Stephanie signed a copy of Wolcott's plan to remove Onfi from Darius' medication regimen upon discharge from the hospital on September 9, 2014. Nonetheless, Stephanie informed Wolcott on September 23 that September 26 would be Darius' last day on Onfi. By September 23, Darius was only receiving a quarter of the dose prescribed in

- 193 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

Wolcott's plan to wean Darius from the medication. Wolcott indicated that Stephanie was not giving the medication as directed. He testified that the seizures that Darius suffered during this time period could be correlated to withdrawal from the medication. He testified that medications like Onfi should not be decreased quickly because side effects can include agitation, seizure, and death.

There is evidence that on several occasions, Stephanie did not give some of Darius' other medications as prescribed. Darius is a child with serious medical needs that are regulated with medication. It is imperative that his medication is given as prescribed. Wolcott testified that Stephanie always informed him at appointments what medication Darius was taking, but there is evidence that she adjusted his medication dosage, at times, prior to or without consulting Wolcott.

Stephanie asserts that medication compliance checks were implemented by DHHS in March 2015 and that "it was determined that medication was being properly administered and [she] was not purposefully altering dosage instructions." Brief for appellant at 22. While this may be true, even an occasional mistake in the administration of Darius' medication could have a serious effect on Darius' health. Further, Stephanie asserts the evidence shows that medication changes were frequent and could occur over the telephone. The evidence before us shows that there are at least a few instances in which Wolcott's records indicate Stephanie did not give medication in accordance with the dosage noted in Wolcott's records.

When the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Upon our review of the evidence, the State proved, by a preponderance of the evidence, that Stephanie's actions with regard to his medical care placed Darius at risk for harm. Thus, the court did not

- 194 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

err in adjudicating Darius as a child within the meaning of
§ 43-247(3)(a) due to the fault or habits of Stephanie.

(b) School Attendance

During the 2014-15 school year, Darius missed almost 60
days of school and had 388 periods of unexcused absences.
Stephanie concedes Darius missed an abnormal amount of
school in 2014-15, but argues that the school was not able
to safely and appropriately care for Darius' medical needs
and that the absences did not place him at risk for harm
due to his diminished intellectual and learning capacity. She
argues that Dawes did not make the same effort to accom-
modate Darius that previous schools had and that the school
did not adequately document Darius' seizure activity. She
asserts Dawes marked incidences when Darius left school
early as parent excused, when he was not medically able
to stay at school because of complications he had with tak-
ing Onfi.

The evidence shows Darius' medical condition results in
periodic absences from school. Absences which are parent
acknowledged or due to illness are marked as unexcused
absences, while absences marked with "medical documenta-
tion" are excused. Stephanie testified that Darius attended
school on October 1 and 2, 2014, and that due to a perceived
issue with how staff handled Darius' behavior and health, she
decided to keep him home from school for the remainder of
the month.

Stephanie testified that based on the information in the
"communication book," she believed Darius was placed in
isolation in Room 140 and was being punished for behavior
that could have been characterized as "pre-seizure activity."
Stephanie did not address her concern with the school or ask
to see the room.

School personnel testified that Room 140 is a room used
by the special education program. It is a calm and quiet
environment where students are allowed to refocus without

- 195 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

disrupting other students. Personnel testified that Darius was never left alone and was always accompanied by a paraeducator.

Stephanie was also concerned that Dawes could not adequately handle Darius and his medical needs when seizures occurred. The evidence shows the school had an IHP in place which allowed school officials to evaluate Darius' ability to continue learning after a seizure. Wolcott testified that he reviewed the school's plan during the school year and that it sounded "extremely reasonable and safe." The plan included monitoring during a seizure and evaluation to determine the severity of the episode. Wolcott testified that if a seizure did not last very long, it would not be necessary to send Darius home. He said if Darius is medically stable after a seizure, there is no advantage for Darius to be at home versus at school.

Stephanie attributed Darius' absence from school in October 2014, in part, to the number of seizures he was experiencing. As previously addressed, Wolcott's plan to wean Darius from Onfi included a gradual decrease in dosage throughout September, October, and part of November. Stephanie stopped administering Onfi in September after sharply decreasing his dosage. Wolcott testified that a rapid decrease in Onfi could cause agitation, seizures, and death. As a result, Darius' absences due to Stephanie's concern regarding increased seizures could very well have been caused by her decision to administer medication other than as prescribed.

School administrators testified that Stephanie stated at a meeting that she was not comfortable sending Darius to school unless her vehicle was in working order. However, the evidence shows Stephanie did not have a vehicle or a driver's license. Darius was transported to and from school by bus, and Lincoln Public Schools was able to provide adequate transportation, if the need arose.

The evidence shows that Darius has lower intellectual function than the average student, but that he is capable of

- 196 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
24 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

learning and practicing academic and social skills while at school. His special education teachers and administrators testified that Darius benefits from the repetition of skills practiced at school and that consistent attendance is important for Darius.

The evidence indicates that Darius had safe transportation to and from school and that the school had plans in place to support his educational and medical needs. The school recognized that Darius would miss school periodically because of his medical condition. The evidence shows Darius was not being punished or isolated for preseizure activity or for behavioral issues which were beyond his control. Educators and school officials testified that even with his limitations, Darius benefited from regular attendance, and that his attendance during the 2014-15 school year was not consistent and his absences did not all correspond with documented seizure activity or medical need. Upon our review of the evidence, we find the State proved by a preponderance of the evidence that Darius lacked proper parental care by reason of the fault or habits of Stephanie in that she failed to adequately provide for Darius' educational needs.

### 2. ADJUDICATION BASED UPON ACTS OF GREGORY

Gregory acknowledges that Darius missed a substantial number of school periods, but asserts that he and Stephanie chose to keep Darius out of school until he was healthy enough to attend and the school was made safe enough for Darius to attend. He refers to Neb. Rev. Stat. § 79-201(2) (Reissue 2014), which states that school attendance is required "except when excused by school authorities or when illness or severe weather conditions make attendance impossible or impracticable." He argues the court erred in failing to consider whether Darius' attendance at school was impracticable, whether Darius was homebound, and whether the school met its obligation to ensure Darius' safe attendance.

- 197 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

As previously discussed, Darius benefits from consistent attendance in school. Stephanie and Gregory are divorced, but share the responsibility of parenting Darius. Gregory stated that as a parent, he is responsible for helping to ensure that Darius attends school. Stephanie testified that even though Gregory does not live in the same home as Stephanie and Darius, he is actively involved in coparenting. Gregory is responsible for transporting Darius to appointments and takes him to school when he is unable to take the bus because of seizure activity or medical appointments.

Gregory testified that he agreed with Stephanie to keep Darius home from school in October 2014 because of the belief that Darius was isolated or punished for preseizure behavior and his medical and intellectual issues. He testified that he visited the school, but because another student was in Room 140 at the time, he decided not to look inside out of respect for that student's privacy. Stephanie and Gregory were both concerned about Room 140, but paraeducators, teachers, and administrators testified that Room 140 was not used to punish or isolate Darius and that the fears of Stephanie and Gregory were unfounded.

Gregory asserts the court erred in not considering whether attendance was impracticable or whether the school was a safe place for Darius to be. This assertion is refuted by the evidence. The evidence shows that the school was notified of Darius' needs prior to the school year and that school officials met with his parents on multiple occasions to address these needs. The protocol for addressing Darius' medical and educational needs were adjusted throughout the year according to the progress he made toward the goals stated in his IEP. School officials, teachers, paraeducators, and staff were aware of Darius' medical needs, and individuals who came in contact with him were given specific instructions for handling medical situations.

The evidence shows that the State proved by a preponderance of the evidence that Darius lacked proper parental

- 198 -

Nebraska Court of Appeals Advance Sheets
24 Nebraska Appellate Reports
IN RE INTEREST OF DARIUS A.
Cite as 24 Neb. App. 178

care by reason of the fault or habits of Gregory as he failed to adequately provide for Darius' educational needs, allowing him to miss almost 60 days of school in a single academic year.

## VI. CONCLUSION

For the reasons stated above, we find the juvenile court properly adjudicated Darius as a child within the meaning of § 43-247(3)(a) due to the fault or habits of both Stephanie and Gregory.

Affirmed.

Riedmann, Judge, participating on briefs.